# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEE XIONG, | ) 1:09-cv-1365 GSA |
| | ) |
| | ) |
| Plaintiff, | ) **ORDER REGARDING PLAINTIFF'S** |
| | ) **SOCIAL SECURITY COMPLAINT** |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## BACKGROUND

Plaintiff Mee Xiong ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for supplemental security income under Title XVI of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  (Doc. 8 & 9.)

## FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff protectively filed an application for supplemental security income on January 12, 2006, alleging disability beginning September 1, 1999, as the result of mental and physical impairments stemming from a seizure disorder and hearing loss.  (AR 15, 17).  Plaintiff's application was denied initially and on reconsideration, and subsequently he requested a hearing before an Administrative Law Judge ("ALJ").  (AR 79-90, 105).  ALJ Bert C. Hoffman, Jr. held a hearing on September 11, 2008, and issued an order denying benefits on February 27, 2009. (AR 15-21).  On June 26 2009, the Appeals Council denied review.  (AR 8-11).

### Hearing Testimony

*Mee Xiong*

On September 11, 2008, in Fresno, California, ALJ Hoffman held a disability hearing during which Plaintiff, represented by attorney Robert Shakon, appeared and testified with the assistance of an interpreter, Chi Yang.  (AR 23-41).  Plaintiff's father, Yong Xiong, also testified. (AR 41-51, 56-62).

At the time of the ALJ's hearing, Plaintiff was a twenty-one year-old male living in Fresno, California with his parents.  (AR 27-28).  He attended Washington Union High School and was generally enrolled in special education classes.  (AR 40).  While at Washington Union, he typically earned average marks in his classes, but he was unable to complete the course work required to graduate before he turned twenty.  (AR 57).

Currently, Plaintiff is attending adult school.  His class schedule fluctuates from twice a week to daily, depending on his course load.  (AR 39).  His classes are taught in English, and he took English while attending Washington Union High School, but his mastery of the language remains elusive.  Plaintiff attributed this to his inability to remember his English lessons.  (AR 48-49).

Plaintiff sometimes gets lost when riding his bike to and/or from the local convenience store.  (AR 42, 50).  He has some concept of money, as he knows if the convenience store clerk is

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

giving him correct change, yet he does not think he could work as a cashier at McDonalds because the position is "difficult." (AR 49-50). Plaintiff, however, believes he could do other duties of a McDonalds' employee, such as wiping tables and washing dishes, because he is already doing those tasks at home. (AR 50). He does not particularly enjoy doing dishes at home, and complains of being tired, but he tries the best he can and often he just does it because his mother told him to. (AR 50-51). Occasionally, he helps his father and brother-in-law with bundling vegetables for retail sale and sometimes picking vegetables. (AR 46-47). Plaintiff enjoys walking to his relatives' residence, who live in a nearby apartment complex. He also enjoyed going on bike rides with his friends to a local Chinese buffet restaurant. (AR 45-46).

When Plaintiff is about to suffer a seizure, he is alerted by a little pain in his head and feelings of disorientation. (AR 43). After his seizure, he is dizzy and it takes from thirty minutes to an hour for him to regain his composure. (AR 44). He last had a seizure a month or two ago. (AR 44). He takes medication daily to control his seizures, and he admits that the medication helps him experience fewer seizures, but the medication also causes memory difficulty, and as a result, sometimes he forgets to take his medication. (AR 42, 45).

### Yong Xiong

Yong Xiong, Plaintiff's father, provided lay testimony at the hearing. He testified that when Plaintiff is struck with a seizure, he stands up, raises his arms, he will not blink, and he begins making a chewing motion. (AR 56, 59). He states that Plaintiff's seizures can last from two to three minutes and that Plaintiff needs to lie down for about thirty minutes after the seizures pass. (AR 56-57). Mr. Xiong and his wife remind Plaintiff to take his medicine daily. Mr. Xiong believes that if Plaintiff takes his medication daily that he can reduce the seizure occurrence to two or three seizures per month[3]. (AR 58-60). However, without the medication, Plaintiff suffers seizures approximately once or twice a day. (AR 59).

---

[3] The transcript reflects that Yong Xiong initially testified that no seizures occurred when Plaintiff took his medicine regularly, but later amended his testimony to say that Plaintiff suffered two or three seizures per month. (AR 58-60).

**Medical Record**

The entire medical record was reviewed by the Court. Those records relevant to the issues on appeal are summarized below. Otherwise, the medical evidence will be referenced as necessary in the Court's decision.

*Ronaldo A. Ballecer, M.D.*

Dr. Ballecer's medical records consist solely of an audiogram[4] which resulted in a diagnosis of "[s]evere right conductive hearing loss [and] normal hearing in the left ear," on January 17, 2005. (AR 213). He recommended that Plaintiff "avoid unnecessary noise exposure and use ear protectors as needed." (AR 213). The doctor's examination also includes a simple "-" notation next to the word "[s]eizures," apparently indicating no objective sign of seizures was present at the time. (AR 213).

*Kings Winery Medical Clinic (KWMC)*

Plaintiff received medical care at KWMC from November 13, 2004, through July 21, 2008. (AR 215-223, 259-261, 287-289, 293-300, 304-315, 319). While more than one physician provided Plaintiff with treatment during the aforementioned period, his primary KWMC care giver was Tou C. Vang, M.D. (AR 319), however, Plaintiff also received care on at least two occasions from M. Parayno, M.D. (AR 304-315) and on at least one occasion by a "Dr. Krueger" (AR 299-300). The records from this facility entail the single largest contribution of medical evidence to this case. Yet other than the September 2008 letter from Dr. Vang, these medical records consist almost exclusively of handwritten progress notes, often illegible, that only briefly document objective information pertaining to Plaintiff's hearing loss and seizure disorder.

On January 31, 2005, Plaintiff complained about his poor hearing, and his sister reported to the attending physician that his hearing was adversely impacting his ability to learn at school. (AR 217). The attending physician recommended Plaintiff "[a]void unnecessary noise exposure [, and] use ear protection." (AR 217).

---

[4] The audiogram was apparently conducted at the behest of John Lubenko, M.D., as opposed to "by" Dr. Lubenko as Defendant suggests. (*See* Doc. 12 at 2 & AR 213.)

The following year, on June 19, 2006, the progress notes begin to document seizures as part of Plaintiff's medical assessment. (AR 299). The attending physician's notations indicate that Dr. Krueger had previously treated Plaintiff's seizure disorder, including prescribing medication. (AR 299). The KWMC physician recommended continuing the medication regimen proposed by Dr. Krueger. (AR 299).

On June 20, 2006, Plaintiff was referred to Dr. Parayno for psychiatric care stemming from his subjective complaints of depression[5]. (AR 298). Plaintiff attributed the onset of his depression to his ongoing seizure disorder. (AR 298).

Plaintiff's father, Yong Xiong, accompanied him to his January 20, 2007, KWMC appointment and complained that the current level of Plaintiff's seizure medication was inadequate. The elder Xiong explained that Plaintiff was suffering seizures once or twice per month, apparently despite his current prescription regimen. (AR 293). Later, on September 10, 2007, Yong Xiong reported that Plaintiff had suffered seizures twice while at school. (AR 308). The progress note of September 10, 2007, also states, "new [medication] not working as well." (AR 308). In inconsistent fashion, the progress note of September 14, 2007, states "[history of] uncontrolled [seizures]." (AR 308). The history of uncontrolled seizures is also noted on the progress note of January 30, 2008. However, on July 21, 2008, the attending physician again identified a history of seizures, but also stated they were controlled with medication. (AR 304).

Finally, on September 1, 2008, Dr Vang provided a narrative report which explained the onset of Plaintiff's seizures as resulting from a traumatic brain injury suffered when he was thirteen. (AR 319). Dr. Vang reported that Plaintiff's seizures cause his eyes to roll up, his extremities to stiffen, and a loss of consciousness for two to three minutes, but no loss of bladder control or bowel function, and no tongue biting. (AR 319). Dr. Vang noted that Plaintiff had been prescribed Phyenytoin ER and Keppra by a neurologist, yet "[h]e continues to have

---

[5] Psychiatric sessions with Dr. Parayno were conducted twice in 2006 and three times in 2007. (AR 296-297, 309, 314-315). The records documenting these visits consist of brief, handwritten progress notes that are mostly illegible. The little information that is discernable conveys only that Plaintiff was assessed with a "depressed mood (309.0)," and apparently he was initially prescribed Wellbutrin (AR 296-297, 314-315), but this was later revised during his last visit in June 2007 to 'no psychotropic [medication].'" (AR 296-297, 309, 314-315).

seizure[s] once or twice per month.  He also has poor attention and poor memory.  He was also seen by a psychiatrist who diagnosed him as having a 'cognitive deficit.'"  (AR 319).  Dr. Vang concluded by opining "[Plaintiff's] ability to work and learn is limited because of his uncontrolled epilepsy, cognitive deficit, and [by] the side effect[s] of his medications which can cause drowsiness."  (AR 319).

### University Medical Center (UMC)

On December 24, 2005, Plaintiff underwent a CT scan of his head.  (AR 258).  The doctor's impression noted a low density abnormality in the right temporal region; he suspected this finding was related to "encephalomalacia related to prior [craniotomy]."  (AR 258).

Plaintiff returned to UMC on February 14, 2006, wherein he was given a neurological consult.  (AR 250-252).  It was reported that Plaintiff's seizures typically occurred about once a month, but that the occurrence would increase to "twice a day if he doesn't take [medications]." (AR 250).  The report also states that Plaintiff had suffered a seizure one week prior, but that he "didn't take [medicine] . . . [G]ot refill and no [seizures] since then."  (AR 250).  The treating physician indicated that Plaintiff had a "[history] of missing [his] medication."  Plaintiff was advised to avoid driving, riding a bicycle, climbing, or swimming.  His prescription of Dilantin was increased.  (AR 252).

### Community Medical Center (CMC)

On November 21, 2005, a CT scan of Plaintiff's brain was conducted.  (AR 303).  The findings included evidence of encephalomalacia of the right temporal lobe, and a previous right temporal craniotomy.  (AR 303).

A few years later, between August and September of 2007, Plaintiff's seizures increased while his medications were adjusted.  (AR 317-318).  However, the doctor's notes indicate that when Plaintiff is off his medication, he experiences one to two seizures per day, but if he is on his medication he experiences none.  (AR 317).

*William A. Spindell, Ph.D.*

On May 20, 2005, Dr. Spindell, a consultative psychologist, examined Plaintiff as part of a State agency disability evaluation. (AR 230-234). The examination administration included use of the TONI III, a non-verbal I.Q. test, and the Wechsler Memory Scale-Revised tests. (AR 231). Dr. Spindell stated that Plaintiff's TONI III raw score was fifteen, which yielded a quotient of 78 that placed Plaintiff in the seventh percentile. He tempered this assessment, however, because he believed the TONI III score was a "significant underestimate" of Plaintiff's actual intellectual ability based on the presence of "significant language difficulties," despite the presence of a professional Hmong interpreter who suggested that Plaintiff's language and verbal abilities were fluent. (AR 231). Plaintiff's Weschler Memory Scale evaluation assessed a Verbal Memory of sixty-five, Visual Memory of seventy-one, General Memory of sixty-six, Attention Concentration Index of fifty-eight, and a Delayed Recall of fifty-four. (AR 231). Dr. Spindell's final impression was that Plaintiff suffered from hearing loss in his right ear, however, the doctor did not have a psychological diagnosis. (AR 231). Dr. Spindell did not address Plaintiff's mental functional capacity, but did indicate that "while his language skills are limited [,] he is able to communicate in a school situation. . . . [H]e probably will be able to address the labor market with more education in English." (AR 232).

*A.R. Garcia, M.D.*

On March 14, 2006, Dr. Garcia, a State agency consulting physician, opined that Plaintiff's mental impairment was not severe based on his level of mental retardation. (AR 262). No specific basis for his disposition is readily apparent to this Court as no other markings or comments, other than those above, are included in the report. (AR 262-275).

*B.X. Vaghaiwalla, M.D.*

On April 5, 2006, Dr. Vaghaiwalla, a State agency analyst and consulting physician, opined that Plaintiff suffered from a seizure disorder as well as hearing loss, but neither of these impairments met the listing level. (AR 276-283). Dr. Vaghaiwalla formed this opinion after reviewing Plaintiff's medical record evidence. (AR 283). While he did assess Plaintiff with

hearing loss and a seizure disorder, he found those impairments to "not [be] at listing level." (AR 283). "[Plaintiff was] not fully credible (alleged severity of learning disorder not fully consistent with objective evidence). Limitations as reflected in RFC most consistent with present objective findings." (AR 283). Dr. Vaghaiwalla found no basis for any exertional, postural, or visual limitations, but did find communicative and environmental limitation based on Plaintiff's hearing loss and seizure disorder respectively. (AR 277-280).

## ALJ's Findings

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff did not meet the disability standard. (AR 15-21, *see also* 20 C.F.R. § 404.1520.) At steps one through three, the ALJ found that: (1) the Plaintiff had not engaged in substantial gainful activity since January 12, 2006; (2) he was severely impaired by his seizure disorder and hearing loss and (3) he did not have an impairment or combination of impairments sufficient to meet or equal a listed impairment in Title 20 of the Code of federal Regulations Part 404, Subpart P, Appendix 1. (AR 17). At step-four, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to "perform work without exertional limitations. He must observe seizure precautions and . . . is restricted to work not requiring acute hearing." (AR 17). The Plaintiff was found to have no past relevant work or transferable job skills, and was unable to communicate in English. (AR 20). He was also classified as a "younger" individual based on his age at the time his application was filed. (AR 20). Based on his age, education, work experience, and RFC, the ALJ found that Plaintiff could perform jobs that exist in significant numbers in the national economy. (AR 20). Finally, the ALJ determined that Plaintiff had not been under a disability "as defined by the Social Security Act, since January 12, 2006, the date the application was filed." (AR 21) (citations omitted).

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial

evidence.  42 U.S.C. § 405 (g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).  Where the evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).

## **REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process.  20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).  Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since January 12, 2006,

the date on his disability application; (2) has a seizure disorder and hearing loss which qualify as "severe" impairments based on the requirements in the Regulations (20 CFR §§ 416.921 *et seq*.); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in  20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to perform work without exertional limitations, but must observe seizure precautions and is restricted to work not requiring acute hearing; and (5) retains the residual functional capacity ("RFC") to perform jobs that exist in significant numbers in the national economy.  (AR 15-21).

Here, Plaintiff argues that the findings are not supported by substantial evidence and are not free of legal error because (1) the ALJ improperly rejected the medical opinion of Plaintiff's treating physicians a KWMC, namely Dr. Tou Vang, (2) the ALJ improperly rejected the testimony of both Plaintiff and his father, Yong Xiong, a third-party witness, and (3) the ALJ reliance on the opinion of Dr. Spindell lacks support by substantial evidence because (a) the Wechsler Memory Scale –Revised test is outdated, and the doctor failed to "provide meaning and guidance" to the Depressed Attention, Concentration Index, and Delayed Recall scores; and (b) the doctor's dismissal of the seventy-eight I.Q. score on the TONI III due to significant language difficulties is converse to the alleged function of the TONI III to provide a norm-referenced measure of intelligence completely free from the use of language.  (Doc. 11 at 7-11).  In turn, Defendant responds by arguing that the ALJ's rejection of opinions from Plaintiff's treating physician was proper as they were inconsistent with the other medical evidence, as well as inconclusive.  Defendant further argues that the ALJ properly assessed the testimony of Plaintiff and his father as not credible as there statements are either in conflict with the medical evidence or display only inconsistency.  Finally, Defendant argues that Plaintiff's assault of Dr. Spindell's opinion lacks merit because the test was the standard test at the time of the evaluation in 2005, and because Plaintiff's argument merely attempts to supplant his own lay opinion for that of Dr. Spindell.  (Doc. 12 at 4-7.)

1

**DISCUSSION**

2

A. *Treating Physician Opinion*

3

As stated above, Plaintiff contends that the ALJ failed to properly weigh the opinions of

4

his treating physicians at KWMC, namely Dr. Vang.  (Doc. 11 at 7-10).  He supports his

5

contention by citing to both subjective and objective findings pertaining to Plaintiff's seizure

6

disorder, and argues that these findings are sufficient to constitute a mental impairment in

7

accordance with Title 20 of the Code of Federal Regulations, Part 404, Subpart P, Appendix 1,

8

sections 11.00F and 11.02.  (Doc. 11 at 7-10).

9

It is well-established in the Ninth Circuit that a treating physician's opinions are entitled

10

to special weight, because a treating physician is employed to cure and has a greater opportunity

11

to know and observe the patient as an individual.  *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th

12

Cir. 1989).  "The treating physician's opinion is not, however, necessarily conclusive as to either

13

a physical condition or the ultimate issue of disability."  *Magallanes v. Bowen*, 881 F.2d 747, 751

14

(9th Cir. 1989).  The weight given a treating physician's opinion depends on whether it is

15

supported by sufficient medical data and is consistent with other evidence in the record.  *See* 20

16

C.F.R. § 404.1527(d)(2).  If the treating physician's opinion is controverted, it may be rejected

17

only if the ALJ makes findings setting forth specific and legitimate reasons that are based on the

18

substantial evidence of record.  *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002);

19

*Magallanes*, 881 F.2d at 751; *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987).  The ALJ

20

may accomplish this task by setting out a detailed and thorough summary of the facts and

21

conflicting clinical evidence, stating his interpretation thereof, and making findings.  *Magallanes*,

22

881 F.2d at 751.  He must offer more than merely his conclusions.  He must set forth his

23

interpretations and explain why they, rather than the doctor's, are correct.  *Embry v. Bowen*, 849

24

F.2d 418, 421-422 (9th Cir. 1988).  On the other hand, if the treating physician's opinion is

25

uncontroverted by another doctor, it may be rejected only for "clear and convincing" reasons.

26

*Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995); *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th

27

Cir. 1991).

28

The Ninth Circuit, however, has also held that "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Thomas*, 278 F.3d at 957; *see also Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).   Additionally, a treating or examining physician's opinion based on the plaintiff's own complaints may be disregarded if the plaintiff's complaints have been properly discounted. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999); *see also Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997); *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).   Moreover, "[w]here the opinion of the claimant's treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating source may itself be substantial evidence; it is then solely the province of the ALJ to resolve the conflict." *Andrews*, 53 F.3d at 1041; *Magallanes*, 881 F.2d at 751; *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir. 1985).

As an initial matter, the Court notes that the KWMC progress notes completed by Plaintiff's treating physicians, including Dr. Vang, primarily reflect Plaintiff's self-reported symptoms, and contain little, if any, objective medical evidence.   For example, Plaintiff cites his report of poor results from the pharmacological changes, that his seizures are uncontrolled, that he is running out of medication, and so on.   (AR 304-306, 308).   Plaintiff cites these passages as evidence of Dr. Vang's improperly rejected medical opinions.   (Doc. 11 at 9).   This Court, however, is not convinced that Dr. Vang's opinion was in fact entirely rejected.   While the ALJ did explicitly reject Dr. Vang's opinion that Plaintiff's seizure disorder was uncontrolled because it was inconsistent with the remainder of the medical evidence (AR 19), the KWMC progress notes completed by Plaintiff's treating physicians, and cited by Plaintiff, do not reflect Dr. Vang's opinion, but are simply a recitation of what Plaintiff reported to him.   Thus, it is not entirely clear that the ALJ actually discounted Dr. Vang's conclusions; rather, he merely found, based on the substantial evidence of record, that the Plaintiff retained the RFC to work without exertional limitation.

Second, the Court notes that the ALJ was presented with contradictory medical evidence. Plaintiff's treating physicians have opined that his seizure disorder is uncontrolled in September 2007 and 2008, as well as in January 2008. (AR 306, 308, 319). They also altered his seizure medication to achieve better results in February 2006, wherein it was also pointed out that Plaintiff had a poor history of following his treatment regimen. It was also noted in August 2007. (AR 252, 317). Yet, after changing the medication in August 2007, Plaintiff's treating physicians quickly reversed course in September 2007 and returned to the medication he was using in August 2007. (AR 318). And, in August of 2007 his treating physicians described his seizure disorder as if it was readily treatable, if not controllable, stating that Plaintiff experienced zero seizures when he was taking his medication regularly, even characterizing the disorder as "controlled" with medication in July 2008. (AR 304, 317). Interestingly, when the KWMC records are viewed longitudinally, the pharmacological approach is more consistent than varied, often simply indicating a continuation of the current regimen by way of a refill. (AR 215-223, 259-261, 287-289, 304-315, 319). Finally, the inconsistency of the medical record is obviously apparent when the records of the examining physicians are contrasted to that of the treating physicians, particularly Dr. Vang. In short, the examining physicians have opined that Plaintiff's seizure disorder, hearing loss and learning disability are present, but not at the level of impairment which Plaintiff and Dr. Vang are alleging. (AR 230-234, 262-283, 319). Given the conflicting medical record, the ALJ was obligated to resolve the inconsistency. *Magallanes*, 881 F.2d at 750.

Plaintiff argues that the CMC chart notes for August 20, 2007, which describe Plaintiff's seizure disorder as controlled with medication, is contradicted by the pharmacologic change the treating doctor implemented as a result of this same encounter[6]. Thus, he reasons that the notation suggesting Plaintiff's seizures are controlled by medication cannot infer anything other than the "treatment array on August 19, 2007 was not sufficient." (Doc. 11 at 8-9). His argument, however, is unavailing.

---

[6] Part of Plaintiff's argument also contends that the ALJ's credibility analysis failed to weigh the testimony of his father properly. This contention will be addressed in the separate "Lay Witness Testimony" section below.

When attempting to resolve conflicts presented in the medical record, the ALJ is entitled to draw inferences logically flowing from the evidence. *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982). In this instance, the ALJ had to resolve a conflict between the amended third-party testimony provided by Plaintiff's father, and the statements made to treating physicians, as well as the conflict between the treating physician opinion and examining physician opinions,[7] both of which pertain to the extent of control Plaintiff's medication provides over his seizure disorder.

While at the disability hearing, Plaintiff's father testified that if Plaintiff takes his medication daily that he can reduce the seizure occurrences to two or three events per month. (AR 58-60). In contrast, the CMC record of August 20, 2007, documents that Plaintiff, or his father, told the physician that he experiences zero seizures while on medication. (AR 318). That Plaintiff or his father are the source of this statement is reasonably inferred from the fact that the statement is housed in the section of the chart note typically used by physicians to document a patient's subjective complaints, e.g., just above the doctor's objective findings, assessment, and plan. (AR 318). While the Court is cognizant that impairments such as Plaintiff's are subject to wax and wane over time, statements that suggest Plaintiff's seizures are at least subject to a degree of control by way of medication are useful in that they reasonably infer that pharmacological treatment is not only beneficial, but has historically been successful at controlling, or at least significantly curtailing, the frequency of Plaintiff's seizures. This inference is supported by substantial evidence in the form of: (1) the neurologic consultation of February 14, 2006, wherein it was reported that the frequency of seizures increased to twice daily when Plaintiff failed to take his medication and decreased to once a month when he did take it; (2) the CMC progress notes of August 20, 2007, describing a similar inverse relationship between the onset of seizures and the regular use of his medication; (3) the KWMC progress notes of March 4, 2008, and July 21, 2008, that also correlates Plaintiff's seizure frequency to his medication use; (4) the testimony of both Plaintiff and his father, wherein each conveyed that the

---

[7] The conflict between the medical records provided by Plaintiff's treating physicians and the examining physicians is described thoroughly in the above section. That discussion will not be repeated here, except as necessary.

regular use of seizure medication curtails the frequency of seizures, and Plaintiff testified that he had experienced only one seizure in the past month or two; and (5) to Dr. Vang's September 1, 2008, letter which stated that Plaintiff's current medications have limited his seizures to "once or twice per month."  (AR 42, 45, 58-60, 250, 304-305, 317, 319).  Thus, while Plaintiff may attempt to characterize the ALJ's reading of the treatment notes as "absolute . . . meaning 100% efficacious treatment eliminating all remnants of the seizure disorder" no such inference was necessary, or likely taken, as all that was required to resolve the conflicts was the reasonable inference that Plaintiff's seizures are subject to a significant degree of control by way of regular use of medication.

To the extent, if any, the ALJ may have rejected Dr. Vang's conclusions, the Court agrees with the Commissioner that the ALJ provided numerous specific and legitimate reasons for doing so, and for concluding that despite Plaintiff's hearing loss and seizure disorder, Plaintiff retains the RFC to perform work without exertional limitations, while observing seizure precautions and avoiding work requiring acute hearing.  (AR 17).  In fact, he carefully reviewed the entire medical record and opinion evidence regarding Plaintiff's seizure disorder, hearing loss, and alleged learning disorder. (AR 15-21.)

In the instant case, the ALJ identified "seizure disorder and a hearing loss" as severe impairments affecting Plaintiff at step two of his disability analysis.  (AR 17).  Then, at step four of his analysis, the ALJ stated:

> The evidence shows that the claimant treated at [KWMC] from November 13, 2004 through January 20, 2007.  On December 8, 2004, the treating records show the claimant was seen, and the doctor noted hearing difficulties and referred for testing.  The claimant was seen on January 17, 2005, by Dr. John Lubenko, for an ear examination.  The exam revealed an infection of the right radical mastoid cavity and a debridement of the right radical cavity was performed.  The doctor also conducted an audiogram which showed a severe conductive hearing loss in the claimant's right ear, and normal hearing in the left.
> On May 20, 2005, the claimant was seen by consultative psychologist William A. Spindell.  Dr. Spindell's examination included administration of the TONI III, a non-verbal I.Q. test, and the Wechsler Memory Scale tests.  The doctor was unable to give the claimant the Wechsler Intelligence Scale for Children because of a language barrier, in spite of the presence of a professional interpreter.  Dr. Spindell stated that the claimant's TONI III score of 15 yielded a quotient of 78.  Dr. Spindell was of the opinion that this score significantly underestimated the claimant's actual intellectual ability.  The Weschler Memory

15

Scale showed mild deficits in memory, which may be due to the claimant's language barrier.  The doctor concluded that the claimant did not have a psychological diagnosis.  He did not offer an opinion on the claimant's mental functional capacity, but cited a lack of English as the primary barrier to employment.

The claimant underwent a CT scan of his brain on November 21, 2005 at [CMC].  The findings indicated that encephalamalcia of the right temporal lobe, and showed evidence of a previous right temporal craniotomy.  One month later, in December 2005 the claimant was seen at [UMC] after suffering a seizure.  The claimant reported experiencing seizures since 2003, following brain surgery.  A CT scan given at that time noted encephalamalcia of the right temporoparietal region.  The claimant returned to UMC on January 6, 2006, following another seizure.  He was prescribed Phenytoin.  On February 14, 2006, the claimant had a neurological consultation.  It was reported that he was hit in the head in 2001 while living in Thailand.  He developed a brain abscess and a craniotomy was performed.  Since that surgery the claimant had experienced seizures.  The frequency of the seizures increased to twice a day when the claimant failed to take his medication; when he took his medication he reported seizures occurring once a month.  The claimant was advised to avoid driving, riding a bicycle, climbing or swimming.  His dosage for Dilantin was increased.  In August 2007 the claimant experienced an increase in seizures while his medications were adjusted.

The claimant continued to treat at [KWMC].  On January 20, 2006, the records show that he was provided with refills for the prescriptions provided by a "Dr. Krueger" for his seizures.  He was seen again in January 2007 for refills on this medication.  In September 2008 Dr. Vang, from [KWMC], provided the claimant with a letter regarding his seizures.  Dr. Vang stated that the seizures occur once or twice per month, last 2 to 3 minutes, with loss of consciousness.  Dr. Vang said the claimant does not lose control of his bladder or bowels during seizures, and does not bite his tongue.  He was taking Kappra and Phenytoin ER for control of the seizures, and was being seen by a neurologist.  Dr. Vang opined that the claimant had a limited ability to work and learn because of uncontrolled epilepsy, a cognitive deficit, and because of drowsiness caused by his medications.

The claimant also had two therapeutic sessions with Dr. M. Parayno, who diagnosed the claimant with an adjustment disorder.  Subsequently Dr. Parayno's notes show that he was not prescribing medication for the claimant's mental problems because of his seizure disorder.

On April 5, 2006, a State agency analyst and consulting physician stated that the claimant had hearing loss and seizure disorder impairments which did not meet the listings.  The analyst concluded that the claimant had no exertional, postural or visual limitations; however, he had hearing limitations and was restricted for seizure precautions.

(AR 17-19) (internal citations omitted).

Having thoroughly summarized the medical evidence, the ALJ began his step-four analysis by first explicitly identifying the governing regulations and rules, specifically Title 20 of the Code of Federal Regulations sections 404.1527 and 416.927, as well as Social Security Rulings 92-2p, 96-6p, and 0603p.  (AR 19).  As to Plaintiff's physical impairments, the ALJ bestowed "substantial weight" on State agency medical consultant Dr. Vaghaiwalla's physical

assessment of Plaintiff.  (AR 19).  He explained that his rationale for doing so was because "[t]he seizures are controlled by medication, the hearing loss does not meet the listings, and the residual functional capacity" attributed to Plaintiff by Dr. Vaghaiwalla's report was "consistent with other medical records."  (AR 19).  The ALJ gave "[l]imited weight" to Dr. Vang's opinion that Plaintiff's seizures were uncontrolled because it was "not supported by the medical evidence." (AR 19).

The above demonstrates that the ALJ astutely perceived an inconsistency between Dr. Vang's opinion that Plaintiff's ability to work and learn was limited because his seizure disorder was uncontrolled, and the contrary opinion of Dr. Vaghaiwalla which implied Plaintiff's seizure disorder was manageable with medication, and imparted only an environmental hazard limitation.  As Dr. Vang was Plaintiff's treating physician, the ALJ would usually be obliged to first provide specific and legitimate reasons warranting an abandonment of the treating physician's opinion.  *Thomas*, 278 F.3d at 957; *Magallanes*, 881 F.2d at 751; *Winan*, 853 F.2d at 647.  However, the ALJ need not accept Dr. Vang's opinion if it is brief, conclusory, and inadequately supported by clinical findings.  *Thomas*, 278 F.3d at 957; *Matney*, 981 F.2d at 1019.  Moreover, if the opinion was based largely on Plaintiff's own complaints, it may be disregarded if Plaintiff's complaints have been properly discounted.  *Morgan*, 169 F.3d at 602; *Sandgathe*, 108 F.3d at 980; *Andrews*, 53 F.3d at 1043.

Dr. Vang's opinion letter was accurately summarized by the ALJ in his disability decision.  (AR 18).  The letter is only two paragraphs.  It first recites the current duration of treatment, and then it provides a historical development and common description of Plaintiff's seizure disorder.  Dr. Vang then recites the findings of a 2005 CT scan before explaining that a neurologist has been treating Plaintiff, currently with prescription for Phenytoin ER and Keppra. He reports that Plaintiff still suffers seizures once or twice per month, and that Plaintiff has poor memory and attention.  He states that a psychologist has diagnosed Plaintiff with a cognitive deficit, and that an ear, nose and throat specialist diagnosed severe conductive hearing loss in Plaintiff's right ear.  Finally, Dr. Vang opines in the second paragraph that Plaintiff's "ability to

work and learn is limited because of his uncontrolled epilepsy, cognitive deficit, and the side

effects of his medications which can cause drowsiness." (AR 319).  Apparently attempting to

support his opinion, Dr. Vang states that he has attached the results of the CT scan, the

consultation notes from Plaintiff's various medical specialists, and he suggests contacting

Plaintiff's medical specialists directly for up-to-date reports.  (AR 319).

Dr. Vang's opinion letter was accorded only limited weight by the ALJ because he found

its conclusions to be unsupported by the medical evidence.  (AR 19).  Likewise, after review of

the entire medical record, this Court finds that the ALJ did not error in devaluing the opinion of

Dr. Vang because the conclusion that Plaintiff's seizures were uncontrolled is only supported by

two brief and conclusory KWMC progress notes from September 2007 and January 2008 that

merely document "[history of] uncontrolled [seizures]," but contain little to no clinical findings

to support that assessment.[8]  (AR 306, 308).  *Thomas*, 278 F.3d at 957; *Matney*, 981 F.2d at

1019.  Moreover, Dr. Vang's two paragraph opinion letter is also brief and conclusory; it fails to

provide any guidance as to how Plaintiff's ability to work is limited or otherwise equate

Plaintiff's alleged impairment to functional limitations applicable to a work setting.  *Thomas*,

278 F.3d at 957; *Matney*, 981 F.2d at 1019; *Morgan v. Comm'r*, 169 F.3d 595 (9th Cir. 1999).

The absence of objective medical evidence supporting Dr. Vang's opinion, the brevity

and conclusory nature of the little medical evidence supporting the opinion, as well as the brief

and conclusory opinion letter itself, are all proper factors that weigh against the opinion that

Plaintiff's seizures are uncontrolled.  In contrast, the conclusion that Plaintiff's seizures are

controlled by medication is well supported by the medical evidence.  For instance, Dr.

Vaghaiwalla opined that Plaintiff's seizures are present, but do not rise to the listing level. (AR

283).  Additionally, the neurologic consultation of February 14, 2006, reported that the frequency

of seizures increased to twice daily when Plaintiff failed to take his medication and decreased to

once a month when he did take it.  (AR 250-252).  The CMC progress note of August 20, 2007,

describes an inverse relationship between the onset of seizures and the regular use of his

---

[8] Plaintiff also argued that the testimony of his father supported Dr. Vang's opinion.  This is addressed below in the separate "Lay Witness Testimony" section.

medication.  (AR 317).  Moreover, the KWMC progress notes of March 4, 2008, and July 21, 2008, correlate Plaintiff's seizure frequency to his medication use, with the July progress note actually reporting that Plaintiff's seizures are "controlled [with] meds."  (AR 204-305).  Finally, Plaintiff testified that the regular use of seizure medication curtails the frequency of seizures, and that he had experienced only one seizure in the past month or two.  (AR 42, 45).  The above demonstrates that the ALJ's decision to forgo Dr. Vang's opinion, and instead rely on the opinion of Dr. Vaghaiwalla, is well supported by substantial evidence.  Moreover, given the inconsistent medical record, this Court finds the ALJ's interpretation of the medical evidence to be well-reasoned and free from legal error. *Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005).

### B.   Lay Witness Testimony

Plaintiff argues the ALJ's credibility determination fails to consider his father's testimony, to the extent that it corresponds with Dr. Vang's opinion that Plaintiff's seizures were uncontrolled, and still occurring once or twice per month.  (Doc. 11 at 9).  Plaintiff does not take issue with any particular part of the ALJ's credibility discussion, but rather seems to merely suggest that the ALJ should have placed more reliance on the testimony, and in so doing he would have arrived at the conclusion that Plaintiff's seizures are uncontrolled to the extent they still occur at least once or twice per month.  (Doc. 11 at 9).  In response, Defendant argues that the ALJ properly discounted the testimony of Plaintiff's father as it was inconsistent with previous statements.  (Doc. 12 at 5).

In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work. *Dodrill v. Shalala,* 12 F.3d 915, 919 (9th Cir. 1993).  "Lay testimony is not equivalent of medically acceptable diagnostic techniques that are ordinarily relied upon to establish disability." *Vincent on Behalf of Vincent v. Heckler,* 739 F.2d 1393, 1395 (9th Cir. 1984).  However, lay witness testimony as to a claimant's symptoms is competent evidence which the Commissioner must take into account. *Dodrill,* 12 F.3d at 919.  Such testimony is competent evidence and cannot be disregarded without comment. ;4820;4820*Nguyen v. Chater,* 100 F.3d 1462, 1467 (9th Cir. 1996).  The ALJ must consider

19

competent lay testimony but in rejecting such evidence, he need only provide reasons for doing so that are "germane to [the] witness." *Carmickle v. Commissioner, Social Sec. Admin.,* 533 F.3d 1155, 1164 (9th Cir. 2008); *Valentine v. Commissioner Social Sec. Admin.,* 574 F.3d 685, 694 (9th Cir. 2009). Disregard of this evidence violates the Secretary's regulation that he will consider observations by non-medical sources as to how an impairment affects a claimant's ability to work. 20 C.F.R. § 404.1513(e)(2); *Sprague v. Bowen,* 812 F.2d 1226, 1232 (9th Cir. 1987). However, inconsistency with medical evidence is a valid reason for rejecting a lay witness's testimony. *Bayliss v. Barnhart,* 427 F.3d 1211, 1218 (9th Cir.2005); *Lewis v. Apfel,* 236 F.3d 503, 511 (9th Cir. 2001).

In this case, the ALJ accurately summarized the elder Xiong's testimony as follows:

> The claimant's father, Yong Yang Xiong, testified at the hearing. Mr. Xiong said his son lives with him. He testified that if his son takes his medication he suffers seizures 2-3 times a month, but without medication they are more frequent. Mr. Xiong testified the claimant attended Washington Union High School, and would miss school 3-4 days a month because of exhaustion from his seizures. Based on the totality of the evidence, this third party testimony is given some weight; however, the frequency of his son's seizures while on medication is contradicted by other objective evidence and is therefore disregarded.

(AR 20).

The above demonstrates that the ALJ's partial rejection of Mr. Xiong's testimony regarding the frequency of his son's seizures is based on its inconsistency with the medical record, which conveyed Plaintiff's seizure frequency ranged from less than once a month to at most twice a month. (AR 250, 304-305, 317, 319). The ALJ accepted the testimony of Plaintiff's father to the extent that it was consistent with the record of Plaintiff's activities and the objective evidence in the record; however, he rejected portions of his testimony that did not meet this standard. *Bayliss v. Barnhart,* 427 F.3d at 1218. The ALJ's rejection of certain testimony is supported by substantial evidence and was not error.

### C.   Dr. Spindell's Opinion and the Substantial Evidence Standard

Plaintiff concludes his brief by arguing that the ALJ erred when he relied on Dr. Spindell's opinion that Plaintiff's mental impairments were non-severe. He supports this contention by alleging the Wechsler Memory Scale – Revised ("WSM-R") tests was outdated,

1    and that Dr. Spindell failed to comment on the portions of his report indicating Plaintiff suffered

2    from memory and intelligence deficits.  (Doc. 11 at 10-12).  Defendant counters by arguing that

3    the ALJ's reliance on Dr. Spindell's opinion was supported by substantial evidence in the

4    medical record, and that Plaintiff is merely attempting to supplant his own medical opinion for

5    that of Dr. Spindell.  (Doc. 12 at 5-7).

6            At step two of the sequential evaluation process, the ALJ must conclude whether Plaintiff

7    suffers from a "severe" impairment.  The regulations define a non-severe impairment as one that

8    does not significantly limit a claimant's physical and mental ability to do basic work activities.

9    An impairment is not severe "if the evidence establishes a slight abnormality that has 'no more

10   than a minimal effect on an individual's ability to work.'"  *Smolen v. Chater*, 80 F. 3d 1273,

11   1290 (9th Cir. 1996).  To satisfy step-two's requirement of a severe impairment, the claimant

12   must prove the existence of a physical or mental impairment by providing medical evidence

13   consisting of signs, symptoms, and laboratory findings; the claimant's own statement of

14   symptoms alone will not suffice.  20 C.F.R. §§ 404.1508; 416.908.  The effects of all symptoms

15   must be evaluated on the basis of a medically determinable impairment which can be shown to

16   be the cause of the symptoms.  20 C.F.R. §§ 404.1529, 416.929.  An overly stringent application

17   of the severity requirement violates the statute by denying benefits to claimants who do meet the

18   statutory definition of disabled.  *Corrao v. Shalala,* 20 F.3d 943, 949 (9th Cir. 1994).

19           The step-two inquiry is a *de minimis* screening device to dispose of groundless or

20   frivolous claims.  *Bowen v. Yuckert,* 482 U.S. 137, 153-154 (1987).  Further, the ALJ must

21   consider the combined effect of all of the claimant's impairments on his ability to function,

22   without regard to whether each alone was sufficiently severe.  42 U.S.C. § 423(d)(2)(B).  The

23   combined effect "shall be considered throughout the disability determination process.  *Id*.  The

24   adjudicator's role at step two is further explained as follows:

25           A determination that an impairment(s) is not severe requires a careful evaluation
             of the medical findings which describe the impairment(s) and an informed
26           judgment about its (their) limiting effects on the individual's physical and mental
             ability(ies) to perform basic work activities; thus, an assessment of function is
27           inherent in the medical evaluation process itself. At the second step of sequential

28

evaluation, then, medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities.

SSR 85-28.  Furthermore, Plaintiff bears the burden to demonstrate that his alleged impairment is sufficiently severe so as to preclude work activity.  *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998).

Here, the ALJ identified Plaintiff's seizure disorder and hearing loss as severe impairments.  (AR 17).  However, the ALJ also determined that Plaintiff's mental impairment was non-severe.  AR 12.  He reasoned as follows:

> In evaluating the claimant's possible psychological impairment, I give substantial weight to the findings of William A. Spindell.  His opinion was based upon a thorough, well-documented examination.  I give some weight to the State agency medical consultant's psychiatric assessment that the claimant's mental impairment was non-severe.  Limited weight is given to Dr. Parayno's treating notes which are too brief to support a finding that the claimant has a "severe" mental impairment.

(AR 19).

Plaintiff's argument that the ALJ erroneously relied on the opinion of Dr. Spindell is unpersuasive.  First, his contention that Dr. Spindell's opinion is compromised by the use of the WMS-R simply because a newer version of the test, the WMS III, was available lacks citation to case law supporting reversal of an ALJ's decision on that basis.  Moreover, while Plaintiff asserts that the psychological community abandoned the concept that the WSM-R was valid, reliable, or appropriately normed, he cites no medical authority to support his statement[9].

Second, Dr. Spindell's report clearly indicates that he at least considered using the Wechsler Intelligence Scale for Children – III, however, he did not use this version in his assessment, likely because of the significant language difficulties that could not be overcome despite the presence of a professional interpreter.   (AR 230-231).  The ALJ expressed this very sentiment in his disability determination.  (AR 18).  On balance, while use of the WMS-III may have provided a more detailed analysis of Plaintiff's memory function when compared to the

---

[9] The Court's research efforts into these two versions of the WSM revealed that the third edition updates the WMS-R and provides subtest and composite scores that assess memory and attention functions using both auditory and visual stimuli.  The third edition retains the index score configuration of the WMS-R, but scale content, administration and scoring procedures have been changed.  Reliability coefficients for the WMS-III primary subtests and primary Indexes were on average found to be higher than for the WMS-R.  http://www.cps.nova.edu/~cpphelp/WMS-3.html

WMS-R, the Court does not find that use of the WMS-R was so egregious as to fall below the standards for reliable test results articulated in Title 20 of the Code of Federal Regulations, Part 404, Subpart P, Appendix 1, Section 12.00 D.5(c).

As to Plaintiff's contention that the ALJ erred in assuming that he only suffered mild deficits despite being assessed with a depressed attention score of fifty-eight, a delayed recall score of fifty-three, and a TONI III I.Q. score of seventy-eight, the Court again disagrees. Dr. Spindell's failure to comment on the depressed attention and delayed recall scores alone does adversely affect the entirety of his opinion. While the low scores may seem significant when viewed in isolation, the results were only a small portion of the overall psychological assessment. Thus, Dr. Spindell's failure to explicitly address the depressed attention and delayed recall scores merely implies that he found the scores insufficient to warrant a psychological diagnosis. *Cf. Vincent v. Heckler*, 739 F.2d 1393, 1394-1395 (9th Cir. 1984) ("[t]he Secretary . . . need not discuss all evidence presented to her. Rather, she must explain why 'significant probative evidence has been rejected.'").

With regard to Plaintiff's allegation that the TONI III I.Q. score was dismissed, the Court is again unpersuaded. Dr. Spindell found Plaintiff's I.Q. score to be a "significant underestimate of his actual abilities" caused by the presence of significant language difficulties despite the presence of a professional interpreter. (AR 231). While Plaintiff may be somewhat mentally impaired, even if his I.Q. score of seventy-eight were an accurate assessment, Plaintiff's mental impairment would still fail to qualify as severe under the governing regulations. *See* 20 C.F.R. pt. 404, app. 1, subpt. P, § 112.05 (mental impairments based on retardation require a full scale IQ of 59 or less, or a full scale IQ of 60 through 70 *and* a physical or other mental impairment imposing additional and significant limitation).

The ALJ's determination that Plaintiff's mental impairment was not severe draws support from the psychological assessment of Dr. Spindell, and to a lesser extent from Dr. Garcia. (AR 19). While the ALJ did examine the records from Dr. Parayno, he found them to be insufficient to infer that Plaintiff suffered from a severe impairment. (AR 19). Given that Plaintiff bears the

burden in establishing the severity of his impairment, and in the absence of medical evidence suggesting that the alleged impairment is severe, the Court finds the ALJ's decision to be a rational interpretation based on substantial evidence and free from legal error. *Burch*, 400 F.3d 676, 680-81.

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff, Mee Xiong.

IT IS SO ORDERED.


**Dated:** __**January 4, 2011**__                    _____ /s/ **Gary S. Austin**_____

                                                    UNITED STATES MAGISTRATE JUDGE